Our next case on the call of the docket is Agenda 11, Case 112-948, Dominic Choate v. Indiana Harbor Belt R.R. Co. At all. Counsel for the appellant. Thank you, Your Honor, and may it please the Court, my name is Evan Tager, representing the Appellant Railroads. It is undisputed that while trespassing on defendant's right-of-way, and despite having been warned over a dozen times that trains are dangerous, Dominic Choate was injured trying to jump on a moving train in order to impress his girlfriend. The appellate court's decision upholding the verdict in Choate's favor is wrong for at least three reasons. First, defendants owed Choate no duty under con because as a matter of law, the dangers of moving trains are obvious to children old enough to be at large. Second, even if that weren't so, the evidence in this case that Choate had actual knowledge that moving trains are dangerous is so overwhelmingly one-sided as to preclude liability. Third, as a matter of law, the cost and burden of preventing children from trying to jump on moving freight trains is not sufficiently modest to allow imposition of a duty on the owners of railroad rights-of-way. With respect to the first ground, this court made clear in Mount Zion that the question whether a particular danger is obvious for purposes of the con doctrine is an issue of law for the court to decide. So the appellate court should have ruled one way or the other whether the danger of a moving train is objectively obvious instead of upholding the verdict on the ground that the issue is one as to which reasonable minds can differ. Turning to that legal issue, the appellate court conducted no analysis of this court's case law. Instead, it simply decided that two prior First District cases, Engle and LaSalle, were dispositive. But both of those cases predate Mount Zion, and neither faithfully applied this court's earlier decisions in Corcoran, Cope, and Logan. Those four prior decisions of this court, along with Kahn itself, supply the governing principles, and those principles leave no doubt that the danger of a moving train is objectively obvious as a matter of law. First, each of the cases recognizes that Kahn is a limited exception to the general rule that landowners are under no duty to protect child trespassers from conditions on their property And if I may, I'd like to read from a short quote from Kahn, which I think captures this so well. And it says, in a civilization based on private ownership, it is considered a socially desirable policy to permit a person use of his land in his own way, without the burden of watching for and protecting those who came there without permission or right. Second, these cases all recognize that the responsibility for children's safety lies primarily with their parents. Third, that means that the duty of a landowner to children on its premises is limited to protecting them against dangers that would not be obvious to children old enough to be at large. Fourth, in its most, in its two most recent cases, Logan and Mount Zion, the court has cast light on the meaning of obvious by contrasting it with latent. If I again may quote from Mount Zion, even if an owner or occupier knows that children frequent his premises, he is not required to protect against the ever-present possibility that children will injure themselves on obvious or common conditions. While certainly there are latent dangers that a child would not appreciate due to his minority, a possessor of land is free to rely upon the assumption that any child old enough to be allowed at large by his parents will appreciate certain obvious dangers, or at least make his own intelligent and responsible choice concerning them. Now, this distinction perfectly describes the contours of the Kahn Doctrine and explains the outcomes of all five cases this Court has decided under Kahn. When a danger is out there in the open, and it is for all children old enough to be at large to see and comprehend, there is no duty. But when the danger is latent, for example, that of a pile of lumber, as in Kahn, that was stacked for efficient loading, or for efficient unloading, rather, not for stability, it is not obvious, and there can be a duty. Now, application of these settled principles here can lead to only one conclusion. The danger of a moving freight train is obvious, as both the restatement and courts throughout the country have recognized. Indeed, that conclusion should be a fortiori from Mount Zion and Corcoran. In Mount Zion, this Court held that the danger of a calm, clear, inviting swimming pool is objectively obvious. And in Corcoran, it held that the danger of a ditch is objectively obvious. If those dangers are obvious, the dangers of a massively large, deafeningly loud moving freight train should be as well. Now, if you agree with us that the danger of moving trains is objectively obvious to children old enough to be at large, then Choate's actual knowledge of the danger doesn't matter. But if you disagree with us, and hold that the danger of moving trains isn't objectively obvious to children generally, Choate's actual knowledge should nonetheless preclude liability. The appellate court rejected our arguments on this issue, on the ground that this aspect of the Kahn Doctrine allows liability so long as the child does not have actual knowledge of the, quote, full, unquote, extent of the danger. In other words, if the child knows that he could get hurt, but doesn't know how badly, he can still recover. Although some authorities do use the modifier full in describing this aspect of the inquiry, the Fourth District in Shull and several courts in the other states have expressly rejected the notion that a child must have knowledge of the full extent of the harm that could befall him in order for the defendant to be relieved of liability. And they were right to do so, because such a rule would encourage children to dissemble on the witness stand. This case is the perfect illustration. Choate's mother testified that she told him about a childhood friend who had lost both his legs after an encounter with a train. She had no possible motivation for lying. But he nonetheless denied that in the more than a dozen times she had warned him about trains, she had ever told him that he could lose a limb. But even if you conclude that knowledge of the full extent of the risk is required, the verdict can't stand for two different reasons. First, the evidence is overwhelming that Choate did have knowledge of the full extent of the danger of a moving freight train. That knowledge included the judicial admissions he made in his deposition, that he knew that trains are dangerous, and that dangerous means that he could be killed or lose a limb. As we explained in our briefs, Choate has consistently repudiated the appellate court's sua sponte reinterpretation of the deposition question as focusing only on his knowledge at the time of the deposition. He's done it in every brief he's written on appeal, first in the appellate court, then in response to the PLA, and again on his merits brief here. So this court should reject that post hoc reinterpretation as well. In addition, as I just mentioned, Choate's mother testified that she told him about a childhood friend who lost both legs in an accident with a train. And the very fact that the train was so large and so loud that he could hear nothing else, is another indication that Choate surely appreciated that if he fell under it, it would kill or severely injure him. The appellate court nonetheless held that whether Choate appreciated the full risk of harm was a jury question, because of his trial testimony that he didn't know that jumping on a moving train is dangerous at the time he was doing it. But that isn't enough under Pedrick, which requires courts to consider all the evidence in the case, and recognizes that evidence that may seem substantial when standing alone, fades to insignificance when viewed in conjunction with the other evidence in the case. In Pedrick itself, the court reversed the jury verdict, explaining that, quote, when the dubious probative value of the testimony of the plaintiffs is considered in the light of the unequivocal testimony by persons with no apparent interest in the outcome of the lawsuit, it may fairly be said that all of the evidence viewed most favorably to the plaintiffs so overwhelmingly favor his defendant that no contrary verdict based on this evidence could ever stand. Now, that statement fits this case like a glove. Indeed, this case should be a fortiori from Pedrick, because Mrs. Choate's testimony that she warned her son that he could lose his legs was against her financial interest, giving it exceptionally strong credibility. Moreover, even if Pedrick did not require the judgment be entered in favor of defendants, they at least were entitled to a special interrogatory about Choate's knowledge of the dangers of moving trains. The interrogatory we proposed was in the right form if the court agrees with us that the standard does not require the child trespasser to have knowledge of the full extent of the danger. But even if you conclude that the standard requires that the plaintiff have knowledge of the full danger, that was not the basis on which Choate objected, and the trial court refused to give the interrogatory. Had the objection been raised, we would have acquiesced to including the adjective full while preserving for appeal the argument that it wasn't necessary. The appellate court's holding that the verdict could be affirmed, even though we were never given a chance to fix an alleged defect in form that had not been brought to our attention, is entirely inconsistent with the powerful statutory policy favoring the use of special interrogatories in cases like this. The appellate court's final error involves Kahn's remedial prong, under which there is a duty only when the cause of the crime is determined. The cost of avoiding harm to the child trespasser is slight. Choate's expert, Dr. Berg, said that the accident likely would not have occurred had defendants done both of two things. First, completely fence the 6,000-foot corridor between Ridgeland and Central Avenues on both sides, continuously replacing the fencing whenever people cut holes in it. And second, build a pedestrian overpass at Austin, monitoring it to determine whether it sufficiently reduced the trespassing problem at the site of the accident, which was about a quarter of a mile from Austin. And if not, build a second overpass there. Now, there are three independent reasons why this testimony is not sufficient to support liability under Kahn. First, and I think this is the easiest, most straightforward, direct answer, is there are no cases in Illinois or anywhere else, to our knowledge, that have imposed the duty on a landowner to undertake such a burdensome effort, which in this case involves coordination with a State agency. But, Mr. Tager, isn't it true, though, that this case didn't involve someone trying to get to the other side? No, it didn't. So that expert testimony regarding an overpass for people wanting to get to the other side, would that be relevant? Well, they felt it was relevant because they couldn't otherwise explain how they would keep people off the tracks when people were constantly off the tracks and not jumping on trains wherever they could encounter them. When people were constantly cutting holes in the fence, the problem they had in the case was they had a fence with a hole in it right across from where the accident occurred. Now, that fence wasn't used to access the tracks here because he came from the opposite side. But they knew going into the case that they couldn't do it just by fencing. They would lose the case because of the hole-cutting problem. So they came up with this theory that the real problem is he would never have jumped on the train had he only been able to cross the tracks. So we'll build him an overpass. That's how we get to where we are. The Commerce Commission regulates a fund, I thought, that was used to protect crossings. Yes, it does. Has that fund ever been used to protect a stretch as large as this or anywhere approaching this? Well, I think I will start my answer by saying I'm not an expert on this, so you'll have to check me. But my understanding is that whenever there's a request to either build or close a crossing, wherever it is, the ICC has to be involved. Was the request made by the railroad here to give protection to that location? Not to that location. And you don't know whether it would even be available to protect a stretch of this size? That's absolutely right. We don't know what they would have done. And the point I was about to make was no court anywhere has imposed the duty on a landowner to do something that requires the approval of a state agency, the cooperation of two different municipalities, and then further cooperation of all the private landowners along the way who would have to grant easements, and then creates a perpetual duty to monitor. Here there were two monitoring duties, according to Dr. Burns. To protect even a crossing, doesn't that involve the cooperation of the landowners that were the mechanics for setting up the automatic gates and so forth? They intrude upon someone else's property. Absolutely. So you do seek, or can seek, the approval and cooperation of private landowners? You can try, but, you know, the problem here was Dr. Burns basically said his whole testimony was don't worry, be happy. You know, it will work out. Landowners will cooperate. We'll figure out how high it needs to be. You'll get the easements you need. The ICC will approve this. The two municipalities will happily go along. But he had not done any background work to actually establish any of this stuff. So, but again, going back to the first point I wanted to make, you won't find any case anywhere that has imposed this kind of duty. A, to have cooperation with all those different entities and permission in the case of the ICC. And B, to perpetually monitor. He had A, you have to monitor the fence and make sure that every time it's cut, it's repaired. B, you have to monitor to see if that crossing is doing its job. If it's still, if people are still accessing the track somewhere else, you've got to build another. So that's completely unprecedented. The other thing he did that I think is completely contrary to Illinois is he took, Illinois law, excuse me, is he took no account of the fact that train flipping can occur anywhere there are tracks. By limiting the scope of his proposed remedy to this one corridor, he disregarded the court's established case law holding that in determining whether a particular remedy is reasonable, courts must consider the cost of replicating it anywhere that the injury could have happened. Choate's own evidence established that trespassing generally, and train flipping in particular, takes place throughout the 55 miles of track that Illinois Harbor Belt patrols. For example, Dr. Berg testified that IHB caught trespassers near the accident site about 15 times a year, while IHB's police chief testified that it caught trespassers roughly 1,000 times a year throughout the system, the 55 miles. That means that only 1.5% of the trespassing took place at the site of the accident. So Berg's testimony that there was no need to replicate his proposed remedial measures systemwide, not only was ipsedixit, but demonstrably disprovable ipsedixit at that. In addition, Defendant's Exhibit 20, which is a compilation of all the recording incidents of trespassing prepared by Dr. Berg over an eight-year period, indicates that trespassers were caught 54 times at Ridgeland and another 68 times at Oxford, which is about a block from the grade crossing at Ridgeland, while trespassers were caught eight times at Central and another 47 times at the Landis Plastics Factory, which is within a couple of blocks of the grade crossing at Central. Now, remember, these are both at grade crossings, so when you're at those crossings, you can easily get to the track. So you've got a lot of trespassing going right there. And yet he says, no, you only need this one overpass within the 6,000-foot corridor, when in fact their own evidence proves that even within this one corridor, there would need to be at least three under Berg's own theory. Finally, even if the burden of fencing in a right-of-way and building an overpass could theoretically be slight enough to allow liability under Kahn, and again, I don't think it's in the least bit consistent with the principles this Court has announced in the prior cases, Dr. Berg's testimony about the cost of these measures is so transparently speculative and unbelievable as to be insufficient as a matter of law. We pointed out many of the things he failed to account for in our briefs, but to hit just a few highlights, he had no idea how high the overpass at Austin would have to be in order to clear the freight trains. He had no idea what it would cost to make it ADA compliant, which would entail lengthy ramps to enable wheelchairs to get from ground level to well above the highest point on the tracks. He had no idea whether landowners in the affected areas would be agreeable to providing the necessary easements, we discussed that earlier, much less how much those easements would cost. He acknowledged that people repeatedly had cut a hole in the fence north of the site, but he offered no estimate for what it would cost to monitor the entire 12,000 feet of fence and to replace it every time it got cut. If I may, I'll just wrap up. Can I read one quote from his testimony? This just proves how speculative it all was. I'll read the quote and sit down. Once you make the initial physical improvements that in my opinion are justified and needed, then you need to monitor. And right now all your questions are speculative because we don't know. If you were to install fencing and put in an overpass, I would expect that that would solve virtually all of the problem. Now it may not. How much of the problem remains, no one would know until you do this. So I can't speculate, nor can you, nor can anyone else, as to what you might find. Thank you, Your Honor. What are you asking us for? Well, our principal form of release re-request is a reverse and render. But failing that, a new trial because of the failure to give the special interrogatory. Is that satisfactory? No. Good morning. May it please the court. Milo Lundblad on behalf of the plaintiff, Dominic Choate. This court has said a number of times that duty, the cornerstone of duty, is foreseeability. And in the defense that the railroads have made, claiming that their train was open and obvious, this court, specifically in Mount Zion, has looked at this and has talked about how do you analyze and what does it mean to be open and obvious. Now the theory is, as I said, if some danger is open and obvious, that people will avoid it because they will know that they will get hurt and they will stay away from it. Therefore, this court has said in Mount Zion, that if something is obvious, people will avoid it. There can be no foreseeability of injury. Now with regard to determining whether something is open and obvious, this court again, in Mount Zion, said that the issue involves not whether the child does in fact understand, but what the possessor may reasonably expect of him. That phrase, I believe, is key and key to this case. We have to look at the facts from the perspective of the defendant railroads. What could they anticipate that children would do on their property in Chicago Ridge? Well, first of all, we had ten boxes, ten boxes of citations that were accumulated over a number of years by Harbor Belt police officers. They saw children on these tracks. They saw children as young as four. They saw children pulling bicycles under standing trains. They saw children crawling between cars trying to get across the tracks. In addition to that, they saw in Chicago Ridge children under the age of 13 trying to catch rides on trains. Specifically that question was asked of Lieutenant Griffith, who said, I've seen them not often. And his memory was refreshed. He said 50. If you look at Mr. Lundlid, are we talking about two different things here? Does the fact that children will decide to proceed, does that take it in and of itself out of the open and obvious realm? Or are we in the position, I'm sure there are kids that drown in swimming pools, too. And as far as the Mount Zion case, you have a six-year-old that they find it's open and obvious for a calm pool, right? To know that that's an open and obvious danger. I think we could probably go through this jurisdiction and others and see a number of tragic children's deaths where they jump in pools anyway, while there was still a finding of open and obviousness. Why wouldn't in this particular case, a 13-year-old taking those same sentiments into account, why wouldn't it be open and obvious for a 13-year-old, not even dealing with a calm pool, but a raging train? Well, I think the distinction between Mount Zion in this case, where Mount Zion involved the swimming pool, is that there was no evidence that children frequented the property. There was no evidence that other kids had crawled over this pedestal to get to the pool. And this court said, actually, that there was no foreseeability. It could have stopped there, but it went on with the analysis. I think the distinction here is that in this record, not only was there the observation of the officers and the data they accumulated, but the eyewitness testimony as well. Austin Patton, who lived in the apartment building, said, I saw kids streaming across those railroad tracks every day. I saw them going across in their Little League uniforms to go to the park that was next door. There was evidence that on the north side, there was a beaten path, a path beaten down by the footprints of God knows how many kids crossing those railroad tracks. I think under those circumstances, when the railroad has the overwhelming knowledge that their property with a dangerous activity going on has a duty. This is not a case of crossing. This is a case of jumping on a train, isn't it? Well, that's the ultimate incident that occurred. However, the testimony was, is that when Dominick and his two male friends, Charlie Spindler and Mr. Wire, went to this parking lot in the apartment building, their purpose, their intention was to cross the track, that they were going to go to Stevie Wire's house that was on the north side of the track. The only reason they didn't is because there was a train in their way. Now, there's some discrepancy in the testimony, but under the Pedrick standard, this court has to look at the evidence most favorable to the plaintiff. Lisa Van Witsenberg testified when they got to this parking lot, there was a train parked. A train parked and blocking the boys from going to where they wanted to go. She also testified that after getting, waiting, the boys got impatient and they decided they were going to go up to the train and crawl through it. And it was at that time the train started moving, and then it was a matter of spontaneousness where Charlie Spindler, according to the testimony of the plaintiff confirmed by Mr. Patton, first attempted to try to catch a ride. This case, if Dr. Berg's remedies had been in place, would never happen. Because those children were... Aren't you really saying that the railroad has a duty to keep children off the right-of-way, period? They have a duty under the... How could they ever do that? I believe they have a duty under the facts of this case because of the knowledge they had of the magnitude of the trespassing going on with children. I believe as test... But doesn't that call into question that they would be required, because they know they're children that get on the right-of-way, that they get off the right-of-way, and if they got on the right-of-way, whether they got injured crawling through a train or they tried to jump on a train, or whatever happens, there would be, there could be liability against the railroad. What plaintiff proposed and what Dr. Berg proposed was providing a safe means for children to cross the tracks. If there had been, if there had been this overpass, and this young lad made a, which was a horrible mistake, horrible decision to try to jump on the train, no doubt about that. Would that have excused them from responsibility? If there had been an overpass present? Yes. If there had been a safe means for Dominick and his friends to cross those tracks, and they chose to not do that and climb over a fence to get to the overpass, and they cross the grade and see the train moving and they decide to jump on it. I mean, I'm thinking that doesn't answer the question of how do they, they would have to prevent the children some way, make sure they cannot get on those tracks. Well, it was Dr. Berg's remedy. What he suggested is that you need to channelize children. You need to have them crossing at where you have bells, whistles, and crossing arms. He said based on his experience, he's been in the business of safety for more than 40 years, that children when they're in that type of setting are not likely to try to catch a ride. They're at a street, they're at a busy place, they're going to cross as they're supposed to. I think that one thing that's been overlooked is that Dr. Berg's remedy was already done. It had already existed on defendants' tracks. This topic was brought up by their own expert, Mr. Bradley, who went out and looked at a site on defendants' track a couple miles away. It was next to an elementary school, and the jury saw pictures of it. There was discussion of it. The area was fenced off. Children were directed to this overpass, which they were using to get from one side of the tracks to the school. So this problem was not, as defendants suggest, something that was impossible. It had already existed and was already in place. Mr. Lindberg, whether there's a remedy, if indeed, there has to be a duty. You would agree we start with a duty, right? And I want to try to understand your argument, which quite frankly, I don't right now. If, aren't you writing out the whole concept of open and obvious? As I understand what you're saying, you're saying even if the danger is open and obvious. We've got a case in 1897 from the first district. We've got jumping on trains and using trains. It's like a textbook example of open and obvious. People talk about that all the time, the appreciation of the open and obvious danger of a raging train. What you're saying, as I understand it, and tell me if it's different, because I want to understand this. You're saying even if there is an open and obvious danger, if there is knowledge that kids are engaging in this open and obvious danger, they're engaging in trying to jump trains or cross the tracks or whatever, even in light of a danger being open and obvious. If they have hard evidence that that's occurring, there is a duty regardless of the danger being open and obvious or not. Is that your argument today, or is it something different than that? No, that's correct. And this court in a number of cases such as Jackson v. TLC has held that if something is open and obvious, that does not end the discussion. It's not a per se bar to finding a duty. Instead, the court has to look at the four factors that go in determining whether or not duty exists under negligence. The first one is. And what case are you referring to now? Jackson v. TLC, Associates. It's a swimming pool case. It was also discussed in the case that we cited, the Ahmad v. Coretti case involving the exercise machine. Were these cases all decided before Mount Zion? No. They were all after Mount Zion? Yes. And in those instances, the court has said you have to look at the four traditional factors for negligence. The first one is, what's the likelihood of an injury? Here we have hundreds of kids. Who knows how many kids crossing every day? And I would like to point out that the second thing is the foreseeability. And I think with all these kids crossing and doing the behavior that was observed of crawling through trains, climbing on trains, that the injury was foreseeable. And I point to the American National Bank case versus Pennsylvania Railroad, where the court there under similar circumstances found a duty. And they said where there are so many kids going back and forth, that it was not only foreseeable, but that incident injury was inevitable. And I think that language and that thought applies here as well. Aren't you asking this court to sort of establish a balancing act between the cost of prevention on one side and duty and the need to protect on the other? Absolutely. I mean, as far as the four traditional negligent factors are concerned, those are the final two. One is, what's the burden or the magnitude of requiring a defendant to remedy the situation? And the other, what's the consequence to that defendant? So duty and need is not just the answer to the problem. Cost of prevention is also a factor to be considered. Yes, that is a factor. Absolutely. Are there any examples of cost of prevention that match the facts of this case, where the protection of an area of this size has been undertaken either through the fund or through the cost to the railroads, the landowners? Well, I believe there was analysis done in, I believe it was the American National Bank versus Pennsylvania case. They were looking at what would be required there. There was an unfinished fence, and they looked at what would be the cost of completing that fence. And the court ruled that the cost was not enough, or it was low enough, that the benefit of preventing further injuries or deaths outweighed that cost. And I think here that, you know, the cost that Mr. Berg presented was $150,000. If you add in the mathematical discrepancies, $200,000. I believe that in balancing it out versus the cost of a death or a child who loses their limb and has to have medical care for the rest of their life, I think that those costs are sufficiently outweighed by the benefit to impose such an obligation. That was a cost for the immediate protection, not the cost for future repairs and alterations. That's correct. I think that Dr. Berg stated that based on his experience, he had dealt with other situations in Wisconsin where he lives, I believe specifically a bike path that crossed over railroad tracks where they had to build an overpass. That was in part his basis of knowledge, and that he found that the cost was not outrageous, and that's where he came up with his figures. I'm kind of concerned, though, if we would actually do what you suggest, is that under these circumstances at this particular place on the track line that they would put a fence, then needless to say the kids would go to another place, and then they'd have to do it further down or someplace else. Wouldn't that be true? Isn't that part of the analysis, is that if you just do it here? And they're actually, from what I can see from the record, maybe you can correct me, is that there really wasn't a school or a bike path or someplace the kids had to get to or use to get to the other side of the track. These kids just used this area because it was too far to go to the regular grade crossing. Right. That's absolutely correct. If you were where Dominic and his friends were, and they wanted to go directly north to Mr. Wire's house, you'd have to walk over half a mile to get to a legal crossing, cross, and walk a half a mile to come back. It was Professor Berg's opinion. Now, he analyzed, as counsel pointed out, that he did a graph of all the various tickets in the area, and there was clusters that occurred where the accident happened a block away at Austin, and within the radius, within the middle, the belly, if you will, of where the track was. And so it was his opinion that he believed that if you had one legal crossing in the middle, that that would be adequate and that would be sufficient to provide the safe crossing that was required by the demand for trips, as he called it, and that it would be satisfactory. But there was no real destination to the other side or on either side that the kids would be going to, just somebody's individual's house. There was not a school. There was not a playground. There wasn't a park or anything like that. Well, I have to respectfully disagree that there was testimony, and in particular I'd refer, Madam Justice, to the testimony of Mr. Trinka, who was a paramedic. He grew up in that neighborhood, and he said when he was a kid 20 years earlier, the same thing was happening. People were going across. And in his testimony, he was asked to map out what was there, and so did Dr. Berg. And what you'll find is that there were schools on the south side. There were schools on the north side. Rich Central High School was on Central Avenue. There was a park right next door to where the injury occurred. There was another park to the north side. You had apartment buildings on both sides. So I think the evidence is that there were kids living along this corridor who had reason to go to both sides, whether to go to school or to visit friends, but certainly to go to school, because I believe there was a middle school on one side and an elementary school on the other. So as the kids got older, they would have to go back and forth. So I think that the ‑‑ Counsel, I'm sorry to interrupt you, but your yellow light is on, and I do have a question. Sure. I'm confused about procedure here. We always say that duty is a matter of law, determination by the court. It sounds like this was a trial about duty. I'm not sure I understand quite how we got to the point of a trial on these issues, when it should be a decision for the court as a matter of law. Those issues were raised in motions for summary judgment, and the court ruled in favor of the plaintiff and found that there was a basis for going forward, a duty. I think that if you look at the jury instruction, the one ‑‑ Wait, wait, wait. Could you help me? The court found that there was a duty, the court found there was not a duty. What did the court ‑‑ I mean, do you agree with me that the principle is that the issue of duty is to be determined by the court as a matter of law? That's the general rule, yes. And did this court make that determination? I believe they followed the Engle decision and said whether or not this particular danger was open and obvious. Therefore, the court didn't have to make a decision as a matter of law? They ruled that there was a triable issue on whether or not something was open and obvious. On duty. Right. So this was a trial on duty. Well, I think that under this particular, under the con doctrine, if you look at the jury instruction number 120 of the IPI, it's like a mixture of fact and duty because, first of all, in order to prevail, plaintiff has to show and prove defendants knew that children were frequenting their property and plaintiff proved that. The second point was that the plaintiff has to show that there was a risk on the property presented to children that they would not appreciate due to their immaturity. And, again, I believe the evidence in the record overwhelmingly establishes that children do not appreciate, do not avoid the dangers that can come along with trains and train tracks. So I think that it's, in some respects, a combination under con and that the jury was given the instruction that has been approved by this court in the IPI and they made a finding in favor of plaintiff based on that. So I believe that it was appropriate to give this case to the jury as the trial judge did and that the jury, they found the elements that plaintiff had to prove. They also found that Mr. Choate was partially at fault, comparatively at fault. They reduced his award by 40%. And I believe that the jury made a just finding, reached a just result that should be affirmed by this court. Thank you. Before you leave, your time has expired, but Justice Thomas has a question. Yeah, I'm going to hit the same nail on the head here, Mr. Lindblad, but you have, and I think you're getting it from the Nelson case at least in part, right, this 06 case, this frequent trespasser doctrine. I think that's part of your papers, isn't it? Yes, it's in every. And that goes to your foreseeability that the railroad had knowledge that there were frequent kids trespassing and doing these type of activities. And I just, again, want to know, I believe we said in Mount Zion that the defendant could reasonably expect trespassing children to appreciate the risk associated with it. So isn't there even in Mount Zion an indication at least that the open and obvious danger would take priority over the knowledge of trespassing, saying that the defendants could reasonably expect them to appreciate? And as a result of that, why wouldn't a railroad in light of our holding in Mount Zion saying, well, yeah, we know about these kids doing it, but there's a case right on point basically on open and obvious danger that says we should be able to expect them to appreciate that risk. We don't have any duty to go any further. Well, as I mentioned before, Your Honor, that there's a difference in Mount Zion in this case. In Mount Zion there was absolutely no evidence that children frequented and used this pedestal to get to the pool. Here the railroads knew they had boxes of documents. They documented the number of occasions kids crossed this railroad track, that they knew that in spite of the trains being on their tracks, kids were nonetheless exposing themselves to the hazard. And in Mount Zion this Court said you have to look at what would be reasonable for the defendants to expect. And I suggest to you that under the facts of this case where the defendants had the knowledge of what was going on in their tracks, it would be unreasonable for them to say that this danger was open and obvious. Thank you. Thank you. A few points in rebuttal. Starting out with the foreseeability point, I think the simple answer is that's a separate element of the Kahn Doctrine that wasn't in dispute here.  establish that the landowner knew or should have known that children frequent the premises. That's an indispensable starting point. So I don't think it's going to enable him to overcome the open and obvious problem. And I think the analogy that Justice Thomas gave about the swimming holes or bodies of water, we know that kids are going to jump in bodies of water. It's foreseeable in that sense. But the legal doctrine is that it's not chargeable to the landowner. As a legal matter, it is foreseeable that children should recognize obvious dangers, and that is the parent's responsibility, not the landowner's, to protect them from that. So that's my first point. With respect to Mr. Lundblad's statement that Mr. Patton testified that he saw kids crossing the tracks frequently, I think this goes back to Justice Burke's point about the difference between crossing tracks and jumping on trains. As the trial court said, this is a jumping on the train to impress my girlfriend case, not a crossing case. And Patton said, when asked, I never saw kids trying to jump on trains at that location. With respect to his statement that this is a new one that he injected into the case after you took it, this idea that it was parked, that is contradicted by Choate himself, by Patton, the disinterested bystander, and by the event data recorder on the train, which said it was moving the entire time. And, you know, event data recorders don't lie. With respect to the location of the proposed overpass, and I think this was Justice Garmon's point, if I'm not mistaken, but it might have been Justice Burke, you're right. There was no one central location that kids were routinely going to as opposed to the school that he adverted to. It's interesting to note that the accident took place midway between Austin and Central. That is to say, Burke wants to build another, not that he doesn't want to build, he wants us to build, another crossing at Austin, which is a quarter mile from where this accident took place, when people were not using the crossing that existed at Central, which was equidistant. So I think that goes to show why this remedy would be insufficient on its own merits. He mentioned a case called Jackson v. TLC, which wasn't cited in the briefs. And my guess is it's an invitee case, not a trespasser case, because the law in invitee cases is that there may still be an exception, even if the plaintiff can't satisfy the con doctrine. But under con and the four cases that this Court has decided applying con, that is the universe to child trespassers. You do not have any other way around if, as a matter of law, the duty is obvious or if you fail on any of the other prongs, the danger is obvious, excuse me. Similarly, the idea of converting con into a balancing test, instead of saying each element has to be independently established, is completely contrary to Corcoran, Cope, Logan, and Mount Zion. In every one of those cases, the Court cut it off after saying there was no obvious danger here. So they didn't say, well, gee, it wouldn't have cost much to prune that tree, and then the swing wouldn't have been caught in it, and he wouldn't have fallen. And therefore, even though heights are an obvious danger, we're going to impose this duty on the landowner. So a balancing test would constitute a fundamental rewriting of the con doctrine. Justice Tice's question about how we got to a trial, I think he may have answered it just to be clear. There was the summary judgment motion. It was originally granted. The judge reconsidered and conflated the subjective and objective components of the danger, and said we need to have a trial here on whether the danger is objectively obvious. And that, of course, is completely mistaken. So finally, on the frequent trespasser doctrine, the only thing I think I'd add on that is the doctrine didn't go to trial. We prevailed on that. There is no procedural mechanism by which he can reinject it into the case at this time as an alternative basis for affirmance, because, you know, that's a cause of action he would have to prove, and he never proved at a trial it wasn't in the case. In any event, he couldn't prove it, which is why we prevailed in the first place, because the only thing that that doctrine would address is if he had been injured crossing the tracks using a well-worn path that he personally had used many times in the past. And that's certainly not what happened here. I think I should end where we were before. This is not a crossing case. This is a jumping-on-a-train case to impress my girlfriend. And that's why the frequent trespasser doctrine is of no use to him. Unless there are further questions, I'll let everybody go to lunch. Thank you. Case number 112948, Dominic Choke v. Indiana Harbor Belt Railroad Company, et al., is taken under advisement as agenda. Number 11, Mr. Marshall, the Illinois Supreme Court stands adjourned until tomorrow morning, May 23, 2012, 9 a.m.